LAKE SUPERIOR DISTRICT POWER COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lake Superior Dist. Power Co. v. Commissioner
Docket No. 2579-79.
United States Tax Court
T.C. Memo 1981-28; 1981 Tax Ct. Memo LEXIS 712; 41 T.C.M. (CCH) 757; T.C.M. (RIA) 81028; January 27, 1981. Paul V. Harris, for the petitioner. Dale L. Newland, for the respondent. TIETJENS
MEMORANDUM OPINION TIETJENS, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: [1]
Year
Deficiency
1975
$ 187,380.83
1976
1,780.19
The issues for our determination are (1) whether petitioner's sale of a 55-mile interconnection transmission line in 1975 constituted an extraordinary retirement under section 167(m)[2] and section *714 1.167(a)-11(d)(3), Income Tax Regs., and (2) whether the underground service extension charges and the primary and overhead line extension charges are, under section 118(b)(3)(A), customer connection fees. [3]
This case was fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulations of facts and attached exhibits are incorporated herein by reference. Petitioner, a Wisconsin corporation, had its principal place of business in Ashland, Wisconsin and the time of its filing its petition. Petitioner timely filed corporate Federal income tax returns for 1975 and 1976 with the Internal Revenue Service Center, Kansas City, Missouri. Petitioner, a regulated public utility within the meaning of sections 118(b)(3)(C) and 7701(a)(33), is an electric, gas, and water utility company providing electric service in all or parts of 13 counties in *715 northern Wisconsin and 2 counties in the western tip of the Upper Peninsula of Michigan. It provides gas service in 16 communities in Wisconsin and in 6 communities in the Upper Peninsula of Michigan. Also, it provides water service in the City of Bayfield, Wisconsin. In 1973, petitioner completed construction of a 55-mile transmission line with a capacity of 161,000 volts between Stone Lake, Wisconsin and Menong, Wisconsin, where it interconnects with petitioner's existing transmission network and then continues to the Washburn-Barron county line near Beaver Lake, Wisconsin. This transmission line was to interconnect physically with Superior Water, Light and Power Company and Northern States Power Company. The interconnection was designed to assure a reliable importation of 50,000 kilowatts of electric power. Because of a financial problem in 1975, petitioner gave up 2 of its wholesale electrical power customers, Bayfield Electric Cooperative, Inc. (hereinafter Bayfield), and Price Electric Cooperative, Inc. (hereinafter Price), to Dairyland Power Cooperative, Inc. (hereinafter Dairyland). However, since these cooperatives were connected to petitioner's transmission lines, *716 Dairyland was charged a "wheeling" charge to transmit electrical power over petitioner's lines. A wheeling charge reflects the charge by one electrical company to use its transmission line to transmit electrical power and energy over its line to another electrical company's customers. On April 22, 1975, petitioner and Dairyland entered into an interim agreement whereby Dairyland agreed to pay petitioner a fee of approximately 2.4 mills per kilowatt hour for electric power and energy delivered through petitioner's transmission facilities to Dairyland's Class A members. During the interim period in 1975, Dairyland paid the following wheeling charges to petitioner: Date
Amount
June 30, 1975
$ 15,758.40
July 31, 1975
15,148.66
August 31, 1975
17,842.70
September 30, 1975
17,733.74
October 31, 1975
14,781.29
Total
$ 81,264.79
On September 10, 1975, petitioner entered into a final agreement with Dairyland, Bayfield, and Price, which stated that petitioner would provide power and energy to Dairyland's member electrical cooperatives through substations connected to petitioner's transmission lines. Presently, petitioner provides a transmission service *717 or "wheels" electric power and energy from Dairyland to 4 of its Class A members: Bayfield, Price, Barron Electric Cooperative, Inc., and Jump River Electric Cooperative, Inc. The Federal Power Commission, Docket Nos. E-9539 and ER-76-173, issued an order authorizing the sale of electrical facilities and approving the wheeling agreement in this case. The sale of the 55-mile transmission line constituted a sale of approximately 48.55 percent of the 1973 vintage account for electric utility transmission and distribution plant. The sale for $ 2,407,000 was based upon the net book value of the transmission line and transformer and did not include in that amount any State of Wisconsin sales tax. On September 10, 1975, Dairyland, Bayfield, and Price acquired all of the benefits and burdens of ownership for tax purposes of the 55-mile interconnection line. On its 1971 Federal corporation income tax return, petitioner elected to depreciate its electric utility transmission and distribution plant by using the class life asset depreciation range (ADR) system contained in section 1.167(a)-11, Income Tax Regs.; and Rev. Proc. 72-10, 1972-1 C.B. 721. For the tax years beginning *718 after December 31, 1970, petitioner elected this depreciation system on all of its Federal corporate income tax returns. In 1973, as well as in 1971 and 1972, petitioner elected to compute depreciation on a composite vintage account guideline class basis, under section 1.167(a)-11(b)(4)(iii), Income Tax Regs., in accordance with Rev. Proc. 64-21, 1964-1 C.B. 685, for the 161,000-volt transmission line and other 1973 additions to its electric utility transmission and distribution plant. In 1976 petitioner did not charge any customer a fee for extending overhead electrical power lines, gas or water mains provided the extension required to service the customer did not exceed a prescribed distance. If, however, the required extension exceeded the free limit, the customers were required to advance a payment described by petitioner as an "aid-to-construction amount equal to the estimated cost of the extension which is in excess of the free limit." The total credits and debits reflected in 1976 in petitioner's Account 252, Customer Advances for Construction, as well as the breakdown of the total amount transferred from Account 252 to Account 271, Contributions in Aid *719 of Construction, are as follows: (1) Total Customer Contributions Received
(2-1-76 to 12-31-76)
$ 95,763.93
Credits from Account 271
505.00
Total Cash Received (January, 1976)
5,146.11
$ 101,415.04
(2) Refunds paid to Customers
$ 11,912.26
(2-1-76 to 12-31-76)
Refunds paid to customers
(January, 1976)
227.33
Cash Received which should be in
Account 107.2
79.35
Transfer to Account 271
(December 31, 1976)
85,660.20
$ 97,879.14
(3) Transfer to Account 271
$ 85,660.20
Transfer Account from Prior Years
(2,731.53)
Transfer Account from January, 1976
(3,484.00)
$ 79,444.67
(4) Electric-
a. Underground Service Extension Charges
$ 43,856.50
b. Transformer Charges
5,747.13
c. Primary and Overhead Line Extension Charges
23,209.33
d. Gas - Excess Footage Charge
4,428.11
e. Water - Hydrant Extension Charges
2,203.60
$ 79,444.67
Those charges to customers by petitioner which were not refundable were transferred at December 31, 1976, from Account 252 to Account 271, Contributions in Aid of Construction. The transfer between Account 252 and Account 271 of December 31, 1976, included $ 5,747.13 which represented customer charges *720 by petitioner for transformers and transformer pads which were installed between petitioner's primary transmission lines and the underground transmission lines to individual customers' homes and businesses. Petitioner argues that its sale of the 55-mile portion of its transmission line did not result in an extraordinary retirement within the meaning of section 1.167(a)-11(d)(3)(ii)(c)(1), Income Tax Regs. Petitioner asserts that although the regulation provides a sale as an example of a retirement, the regulation precedes the reference to a sale of an asset with the requirement that it be "permanently withdrawn from use in a trade or business or in the production of income by the taxpayer." Accordingly, petitioner maintains, the factual requirement of a future absence of use is not present here. Similarly, petitioner argues, that since under section 1.167(a)-11(d)(3)(ii)( c)(1), Income Tax Regs., an extraordinary retirement occurs if the sale results in "a cessation, termination, curtailment, or disposition of a business, manufacturing, or other income producing process, operation, facility or unit," there can be no "disposition" without the factual absence of *721 future use. Petitioner concludes that here, by the final agreement on September 10, 1975, it was granted some of the legal and economic benefits of ownership when it continued to use the line. Concerning the second issue, petitioner urges that aesthetics should not create a customer connection fee; since petitioner offered free overground electric line connection, the customer's decision to have the more expensive underground electric line connection should not effect, under section 118(b)(3)(A), a customer connection fee. By contrast, respondent contends that petitioner's sale of a 55-mile interconnection transmission line, on September 10, 1975, constituted an extraordinary retirement upon which gain must be recognized under the class life and asset depreciation range (ADR) system embodied in section 167(m) and section 1.167(a)-11(d)(3), Income Tax Regs. First, he argues, petitioner's election of the ADR system for electrical transmission and distribution property acquired in 1973 and placed in a single vintage account constituted consent to the retirement regulations contained in section 1.167(a)-11(d)(3), Income Tax Regs., whereby a sale of more than 20 percent of the unadjusted *722 basis of the 1973 vintage account constituted an extraordinary retirement such that, under section 1.167(a)-11(d)(3)(iv), Income Tax Regs., gain or loss realized on the sale must be recognized.Respondent asserts that petitioner's theory of requiring both a sale and future nonusage is unsupported by any reasonable interpretation of the regulation. He, moreover, affirms that petitioner's underground electrical extension charges represent customer connection fees, and are thus not contributions in aid of construction pursuant to section 118(b)(1), because the legislative history of the statute clearly excludes underground electrical connection fees from contributions in aid of construction. We agree with respondent. Section 167(m) authorizes the creation of a class life system which reasonably reflects the anticipated useful life of that class of property. Section 167(m)(3) provides that an election of this depreciation system be made in accordance with the time, manner, conditions set forth in the Secretary's regulations. Petitioner established a 1973 vintage account for electric utility transmission and distribution plant property additions and elected the composite ADR depreciation *723 system described in section 1.167(a)-11(b)(4)(iii), Income Tax Regs., and Rev. Proc. 64-21, 1964-1 C.B. 685. Petitioner's election subjected it to the retirement rules contained in section 1.167(a)-11(d)(3), Income Tax Regs. Under section 1.167(a)-11(d)(3)(iv), Income Tax Regs., if the sale of the interconnection line constitutes an "extraordinary" retirement, petitioner must recognize gain from the sale. If, however, the sale constitutes an ordinary retirement, gain in recognized only to the extent specified in section 1.167(a)-11(d)(3)(iii), Income Tax Regs.
In general, a retirement of an asset in a vintage account occurs: when such asset is permanently withdrawn from use in a trade or business or in the production of income by the taxpayer. A retirement may occur as a result of a sale or exchange, by other act of the taxpayer amounting to a permanent disposition of an asset, or by physical abandonment of an asset. A retirement may also occur by transfer of an asset to supplies or scrap. Sec. 1.167(a)-11(d)(3)(i), Income Tax Regs. An "extraordinary" retirement is one wherein: (a) The asset is section 1250 property; (b) The asset is section 1245 property *724 which is retired as the direct result of fire, storm, shipwreck, or other casualty and the taxpayer, at his option consistently applied (taking into account type, frequency, and the size of such casualties) treats such retirements as extraordinary; or (c)(1) The asset is section 1245 property which is retired (other than by transfer to supplies or scrap) in a taxable year as the direct result of a cessation, termination, curtailment, or disposition of a business, manufacturing, or other income producing process, operation, facility or unit, and (2) the unadjusted basis (determined without regard to subdivision (vi) of this subparagraph) of all such assets so retired in such taxable year from such account as a direct result of the event described in (c)(1) of this subdivision exceeds 20 percent of the unadjusted basis of such account immediately prior to such event.
Sec. 1.167(a)-11(d)(3)(ii), Income Tax Regs. An "ordinary" retirement is any retirement of section 1245 property from a vintage account which is not treated as an "extraordinary" retirement. Sec. 1.167(a)-11(d)(3)(ii), Income Tax Regs.
Example (1), section 1.167(a)-11(d)(3)(ii), Income Tax Regs. *725 , describes a sale of certain machinery as the result of the termination of a manufacturing process. Because the total unadjusted basis of the section 1245 property retired was less than 20 percent of the unadjusted basis of the vintage account to which these assets belonged, the regulation states, the sales are ordinary retirements. In Example (2) of this section, the taxpayer sells one-half of his milk delivery trucks because he decides to eliminate suburban home deliberies. The example states that the sales result from the curtailment of the taxpayer's home delivery service.Because the unadjusted basis exceeds 20 percent of the total unadjusted basis of the affected accounts, the regulation concludes, the sales of the trucks are extraordinary retirements.
From the above examples and a comparison between the definitions for a retirement and an extraordinary retirement, we conclude that an ordinary retirement of section 1245 property occurs either (1) where property is retired by a transfer of an asset to supplies or scrap or (2) the property, not retired as a result of a casualty, is retired but has an unadjusted basis which does not exceed 20 percent of the unadjusted basis *726 of the vintage account immediately before its retirement. Petitioner, on the one hand, maintains that the sale of its 55-mile line constitutes an ordinary retirement; on the other hand, it emphasizes that it could not constitute an extraordinary retirement since the facts here show no future future nonuse of the line. We do not understand how petitioner's assertions are compatible with each other. An asset is retired "when such asset is permanently withdrawn from use in a trade or business * * * [and] * * * may occur as the result of a sale." An "extraordinary" retirement occurs when section 1245 property is retired "as the direct result of a cessation, termination, curtailment, or disposition" and its unadjusted basis exceeds 20 percent of the unadjusted basis of such vintage account immediately prior to that event. Where the definition of a retirement speaks of total future nonuse, the definition of an extraordinary retirement includes a "curtailment" or reduction in use and a "disposition" which includes "a sale." [4] Petitioner's argument, therefore, appears to be internally inconsistent. [5]
*727 Because the sale of petitioner's 55-mile interconnection line constitutes an extraordinary retirement, petitioner must recognize gain from that sale. Section 118(a) provides that contributions to the capital of a corporation are not includable in its gross income. Section 118(b)(1) provides that contributions in aid of construction are contributions to the capital of the taxpayer. Customer connection fees, including, inter alia, amounts paid to connect the customer's line to a main electric line, are not, under the definitions in section 118(b)(3)(A), contributions in aid of construction. Both parties agree that the legislative history of section 118 indicates that customer connections embrace underground, as well as overground, customer connections.[6] The pivotal question, therefore, is a factual one: were the fees charged for installing a connection from the main line to the customer's line? Petitioner argues that the fees were charged merely for optional underground connections which were selected generally for esthetic reasons and were not charged to connect the main *728 line to the customer's line since, under local law, such overhead service had to be provided on a "no charge" basis.
Despite the optional nature of the type of connection, however, the fees were indeed charged for installing a connection from the main line to the customer's line. That no-cost alternatives existed does not change what are clearly customer connection fees into contributions in aid of construction. The fees received from customers for connecting their lines with the main lines are includable in petitioner's gross income for 1976. Additionally, those amounts of the "primary and overhead line extension charges" which represent fees imposed on customers whose connections to the main line exceeded the free limit are similarly customer connection fees and includable in petitioner's 1976 gross income. Decision will be entered under Rule 155.
Footnotes
1. A proposed deficiency in Federal income tax for 1974 was settled by execution of Form 870 on July 25, 1975; therefore, this year is no longer in issue. In addition, respondent has conceded that petitioner is entitled to a deduction in 1976 of $ 70,135.42 for Wisconsin sales taxes paid by it on the sale of an interconnection transmission line in 1975 to Dairyland Power Co., Inc. Petitioner has conceded that it is not entitled to a deduction in 1975 for this same item. Therefore, a decision under Rule 155, Tax Court Rules of Practice and Procedure↩, will be necessary in this case.
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, unless otherwise stated. ↩
3. On brief, petitioner has conceded that the gas and water excess footage charges are customer connection fees and thereby includable in its taxable income.↩
4. The second example in the regulation clearly contemplates an extraordinary retirement as including a sale. A disposition, furthermore, among other definitions, is "the transfer of property from one to another (as by gift, barter, or sale or by will) or the scheme or arrangement by which such transfer is effected." Webster's Third New International Distionary (1976), p. 654. ↩
5. While petitioner, in its brief, appeared to argue that the facts her do not constitute a retirement, petitioner asserts, in its reply brief, "Petitioner does not contend the sale did not result in a retirement, because the sale did result in a retirement. Petitioner contends that the sale resulted in an ordinary retirement pursuant to reg. sec. 1.167(a)-11(d)(3)(ii)" (p. 2, petitioner's reply brief).↩
6. See S. Rept. 95-1263, 95th Cong., 2d Sess. 182 n. 4 (1978), 1978-3 C.B. 315↩, 480.